UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

JAYSON L. PETROSKI,                         Case No. 2:19-cv-00160

                Plaintiff,                  Hon. Maarten Vermaat
                                            U.S. Magistrate Judge
        v.

COMMISSIONER OF SOCIAL SECURITY,

                Defendant.
_____/

## REPORT AND RECOMMENDATION

### I.    Introduction

On April 4, 2016, Plaintiff Jayson L. Petroski applied for child's insurance benefits and supplementary security income (SSI) with an onset date of September 3, 1999 (his date of birth).  (ECF No. 6-5, PageID.208, 226.)  Petroski alleges that he suffers from a number of severe impairments, including attention-deficit/hyperactivity disorder, depressive disorder NOS (not otherwise specified), anxiety disorder, tic disorder, autistic disorder, mood disorder NOS, hypersomnia, and vision problems.  (ECF No. 6-6, PageID.253.)  The Social Security Administration denied Petroski's application, and he requested a hearing before an Administrative Law Judge (ALJ).  (ECF No. 6-4, PageID.115-133.)  ALJ William Shenkenberg conducted this hearing on May 24, 2018.  (ECF No. 6-2, PageID.60-99.)  Then, on October 23, 2018, Judge Shenkenberg issued a decision ruling that Petroski was not

under a disability either before he turned 18, or from September 3, 2017, the day Petroski turned 18, through the date of decision.  (*Id*., PageID.32-54.)

Petroski now appeals Judge Shenkenberg's decision.  (ECF No. 1, PageID.1.) He argues that the ALJ made five specific errors.  Petroski argues (1) that the ALJ erred by not properly evaluating listings 112.04 and 112.11, and by failing to consider listing 112.06 relating to Petroski's anxiety impairment, (2) that the ALJ erred  by failing to determine that his impairments met listing equivalency requirements by concluding that Petroski did not have at least two marked limitations or one extreme limitation in the six domains of functioning, (3) that the ALJ erred in considering the opinion of Petroski's treating psychiatrist, (4) that the ALJ erred in considering Petroski's credibility, and (5) that the ALJ erred in formulating Petroski's residual functional capacity (RFC) after he turned 18 years old and by finding that he could perform jobs in the national economy as an adult.

ALJ Shenkenberg's explanation as to why Petroski could not meet a childhood listed impairment and why his mental impairments could not satisfy the equivalency requirements is supported by sound reasoning and substantial evidence.  The ALJ gave good reasons for giving less than controlling weight to Dr. Razdan's opinions based on the totality of the medical record and Dr. Razdan's own treatment notes.  In addition, substantial evidence supports the ALJ's conclusion that Petroski's description of the intensity, persistence, and limiting effects of his symptoms were inconsistent with the evidence of the record.  The ALJ's RFC assessment, when analyzing Petroski's claim after he turned 18 years old, was based upon the overall

2

record and was supported by substantial evidence.  In the opinion of the undersigned, after careful consideration of the arguments and the evidence in the record, it is recommended that the Court affirm the decision of the Commissioner.

## II.    Summary of Plaintiff's Background and Medical Care and Evaluations During the Relevant Period

Petroski moved to Iron River, Michigan from Illinois with his family in June of 2013.  (ECF No. 6-8, PageID.402.)  In July of 2013, he began treatment at Northpointe Behavioral Healthcare System, where he met his primary treating psychiatrist, Dr. Amit Razdan.  (*Id*.)  In Illinois, Petroski attended a therapeutic day school.  (*Id*.)  In Michigan, Petroski attended public school, but struggled until he moved to an online program after he needed to repeat the ninth grade.  (*Id*.)  Early on, Petroski had difficulties with unhappiness, anger, and worry.  (*Id*.)  He did not follow rules and was aggressive with his parents.  (*Id*.)  At one point he was hospitalized for suicidal ideation.  (*Id*.)

As of March 26, 2015, Petroski indicated that he was depressed, rating his depression as a 5 out of 10, and stating that he saw no point in attending school.  (*Id*., PageID.429.)   His parents indicated that he was struggling, and that recent medication, Zoloft, was not beneficial and may have been making him more irritable. (*Id*.)  Dr. Razdan set a schedule to taper Petroski off the medication Zoloft so that he could start a trial of the medication Lexapro.  (*Id*., PageID.432-434.)  Dr. Razdan noted that he would request a referral for a sleep study.  (*Id*.)

By July of 2015, Petroski made significant attitude and behavioral improvements, and was described as really good, highly intelligent, good at gaming,

kind and considerate, and as an individual who likes to help people.  (*Id.*, PageID.402.)

On October 15, 2015, Dr. Razdan reported that Petroski was waiting to be reassigned to freshman-level online classes, and was mostly playing video games, sleeping, and eating.  (ECF No. 6-8, PageID.370-375.)  Petroski was being seen by Dr. Whaley, a pediatric sleep specialist, and was scheduled for a sleep study.  (*Id.*)

Dr. Razdan evaluated Petroski on December 3, 2015.  (ECF No. 6-8, PageID.364-369.)  Petroski reported that his online schooling was going well and that he was sometimes tired but slept "fair."  (*Id.*)  Petroski had initially struggled with his online schooling.  (*Id.*, PageID.422.)  His father reported that Petroski's sleeping was not the best, and Dr. Razdan indicated that the October sleep study results indicated evidence of hypersomnia.  (*Id.*, PageID.364-369.)  Petroski received Focalin XR, a stimulant medication, for hypersomnia.  (*Id.*)

On January 21, 2016, Petroski was evaluated by Dr. Razdan.  (ECF No. 6-8, PageID.358-363.)  Petroski reported success with online schooling and that he was happy that he was back with his girlfriend, but that he was a little depressed because he felt like he had no friends.  (*Id.*)  He was doing well on his medications.  (*Id.*)  Petroski weighed 276 pounds.  (*Id.*, at PageID.360.)

Dr. Razdan evaluated Petroski on March 17, 2016.  (ECF No. 6-8, PageID.352-357.)  Petroski reported that he was passing all his online classes and was receiving help from his mother.  (*Id.*, PageID.352.)  He spent his time playing video games and going out with his family.  (*Id.*)  He stated that he was feeling "empty" but not

depressed. (*Id.*) He had a good appetite and his sleep was mostly okay. (*Id.*) Petroski's parents requested that he be tested for Asperger Syndrome to explore the benefit through Northpointe BHS. (*Id.*)

In May of 2016, Petroski reported that "things are good", which included school. (*Id.*, PageID.449.) He reported that he had progressed, was sleeping well, and had a female friend who came over and played online games with him. (*Id.*) Petroski's parents reported that he was doing "okay" and that he was on a good medication regime. (*Id.*)

On June 2, 2016, it was noted that Dr. Razdan had recommended a sleep study due to day-time sleepiness. (ECF No. 6-7, PageID.341.) His parents reported that he did not do chores and would miss medications if not provided by them. (*Id.*) As of September 1, 2016, Petroski expressed depression after he watched a cartoon which caused him to worry about his parents dying. (ECF No. 6-9, PageID.530.) He came to the realization that he needed to make changes to his lifestyle so that he could take care of himself. (*Id.*)

On June 15, 2017, Petroski's father reported that medications were helpful and he was in a "good place." (ECF No. 6-9, PageID.513.) Petroski indicated that he had talked about killing himself when he was angry, but he never meant it. (*Id.* at PageID.515.) He admitted trying to intimidate his parents in the past, but was maturing and was better at controlling his anger. (*Id.*)

At his January 4, 2018 exam, Petroski indicated that he was not happy turning 18 years old and becoming an adult. (ECF No. 6-9, PageID.500.)

Petroski's weight ranged between 295-304 pounds and he was 5 feet 11 inches tall during checks between November of 2017 and March of 2018.  (ECF No. 6-9, PageID.493.)  During his February 8, 2018 exam, Petroski reported increased stress and depression, and that he was not sleeping well.  (*Id*., PageID.496.)  He had more tics and twitches and was feeling pressured and invalidated by everyone.  (*Id*.)

On April 26, 2018, Dr, Razdan diagnosed Petroski with Attention Deficit/Hyperactivity Disorder, persistent depressive disorder, persistent motor or vocal tic disorder, social communication disorder, hypersomnia, and academic or education problems.  (ECF No. 6-9, PageID.490.)  Dr. Razdan noted he had ruled out social anxiety disorder, autism spectrum disorder, and dependent personality disorder.  (*Id*.)  Dr. Razdan noted Petroski "cannot function independently and needs the support of his parents for housing, shelter, monitoring his medications and administering his medications, as well as finances.  At this time, given the severity of his psychiatric symptoms and functional impairment, he would benefit from disability."  (*Id*.)

Dr. Razdan completed a functional report on May 15, 2018.  (*Id*., pageID.533-538.)  Dr. Razdan reported that Petroski's symptoms include depression, anxiety, lack of focus/concentration, hypersomnia, poor follow through, and fear of change and/or confrontation.  (*Id*., PageID.533.)  Dr. Razdan indicated that Petroski had a moderate ability to understand, remember or apply information, concentrate, and engage in tasks around others.  (*Id*., PageID.534.)  He had marked limitations in interacting with    others,    concentration,    persistence,    maintaining    pace,    adaptability,

comprehension, and self-management.  Petroski struggled with becoming frustrated while performing tasks, causing him to lose self-control.  (*Id.*)  Dr. Razdan indicated that he did not believe that Petroski could work full time on a consistent basis.  (*Id.*, PageID.537.)  He explained that Petroski had self-reported physical ailments that caused a decreased ability to stand, sit, lift, and twist for a long period of time.  (*Id.*)  Dr. Razdan further explained that it is unknown how Petroski would handle a job because he had never held a job.  (*Id.*)  And he stated that Petroski had trouble communicating thoughts, understanding what would be required of him, and that he would be off-task more than 20 percent of the time.  (*Id.*)

On May 24, 2018, Petroski testified before the ALJ.  (ECF No. 6-2, PageID.65.)  During the hearing, Petroski said that he attended school through the eighth grade and then took online classes at home.  (*Id.* at PageID.67.)  He completed his freshman year of high school, but stopped attending during his sophomore year due to the amount of stress caused by the workload.  (*Id.*)  Petroski stated he was six-foot tall and weighed 300 pounds.  (*Id.*)

Petroski indicated that when he is under stress, he quickly gets overwhelmed and cannot do anything.  (*Id.*, PageID.69.)  He said he that he spends an average day in his room, sleeping, eating, or occasionally talking to acquaintances online.  (*Id.*)  He said he would also go with his parents when they go out.  (*Id.*)  And he reported seeing his therapist once a month.  (*Id.*)

Petroski said that while he was in school, he attended every day.  (*Id.*, PageID.70-71.)  He said he very rarely got in trouble in recent years, but said he

received many in-school suspensions while in elementary school. (*Id.*, Page71.) Petroski said that although he did not have problems with teachers, other students considered him an outcast and would sometimes pick on him and, because he had a temper, he would sometimes retaliate. (*Id.*, PageID.72.) He also reported that he controlling his temper much better at the time of the hearing. (*Id.*)

Petroski said that he sometimes wakes up for the day at 4:00 A.M. But then he said that sometimes he did not get up until 3:00 PM. (*Id.*) He said that his mother prepared all of his meals and snacks. (*Id.*, PageID.73.) And he said that when his parents were not home, he would heat up prepared meals in the microwave oven. (*Id.*)

Petroski testified that, after breakfast, he usually went back to sleep or watched videos until he fell asleep. (*Id.*, PageID.74.) He said that when he woke up, he would usually eat lunch. (*Id.*, PageID.75.) He said he met his friends online while playing games. (*Id.*)

Petroski said that he met one of his friends, whom he would see about once a month, while volunteering at a soup kitchen. (*Id.*, PageID.78.) He said he mostly talked with his friend while he volunteered. (*Id.*) He said he occasionally went shopping with his parents and did not have a driver's license. (*Id.*, PageID.79.)

The only chore that Petroski said he could handle is taking out the garbage. But he said he still required help with that. (*Id.*, PageID.79, 91.) Other chores, like mowing the grass, were reportedly too much for him to handle, because his weight and the large lawn caused him to feel overwhelmed. (*Id.*, PageID.80.)

Petroski testified that, in the past, he had experienced depression that made him feel like he wanted to hurt himself, and was once hospitalized for a month in August of 2012.  Petroski said that he did not believe that he would actually hurt himself.  (*Id.*, PageID.81, 91.)

He said that he prefers not to be in large or medium sized crowds.  (*Id.*, PageID.82.)  He said that when he goes outside, he walks around the block and occasionally goes to a friend's house.  (*Id.*, PageID.83.)

Petroski's father testified that his son has a problem getting focused on the present and needs to be reminded of little tasks and his medication schedule.  (*Id.*, PageID.86.)  He stated that his son had trouble making friends and lacked social skills.  (*Id.*, PageID.87.)  He stated that his son also had trouble with his teachers, who could not understand why he lacked focus.  (*Id.*)  He stated that his son could not stay focused even when participating in homeschooling. (*Id.*, PageID.87-88.)  He said that his son does not really do anything independently.  (*Id.*, PageID.90.)

### III.    ALJ's Decision

ALJ Shenkenberg's 23-page decision is the focus of this appeal.   In this decision, ALJ Shenkenberg  considered whether Petroski was eligible for children's disability benefits before he turned 18 years old, and whether he qualified for SSI benefits after turning age 18.  ALJ Shenkenberg stated both the three-step sequential process used to determine childhood disability and the five-step sequential process used to determine whether an adult is disabled.  (ECF No. 6-2, PageID.33-37.)

Before stating his findings at each step, the ALJ found that Petroski had not attained age 22 prior to his alleged onset date of September 3, 1999, and that he was considered an "adolescent" because he was in the 12 to 18 age group at the time of his application on March 21, 2016. (*Id.*, PageID.37.) The ALJ stated that Petroski turned 18 on September 2, 2017. (*Id.*)

At step one of the three-step childhood disability assessment, the ALJ found that Petroski had not engaged in substantial gainful activity since his application was filed. (*Id.*)

At step two, the ALJ found that before turning age 18, Petroski had the following severe impairments: affective disorder, anxiety disorder, attention deficient disorder (ADHD), oppositional defiant disorder, and a facial/vocal tic disorder. (*Id.*) Petroski had non-severe impairments of asthma, obesity, vision problems, history of speech and language impairment, dyslipidemia, and a sleep disorder. (*Id.*)

At step three, the ALJ found that Petroski did not have an impairment or combination of impairments that met or medically equaled an impairment listed in 20 C.F.R., Part 404, Subpart P, App'x 1. (*Id.*) The ALJ noted that he had considered and rejected the following listings: 112.04 (*Depressive, bipolar and related disorders for children*); 112.11 (*Neurodevelopmental disorders for children*). (*Id.* at PageID.39.)

The ALJ found that Petroski's mental impairments did not meet listing 112.04A listings of major depressive syndrome, manic syndrome, or bipolar syndrome along with a 112.04B listing of at least two marked impairments in age-appropriate criteria as contemplated by listing 112.02B (*Neurocognitive disorders for children*).

Further, the ALJ noted that Petroski had less than marked limitation in each of the functional domain mental areas.  (*Id.*)

The ALJ found that Petroski did not meet listing 112.11 because he did not have documented findings of marked inattention, marked impulsiveness, and marked hyperactivity.  In addition, Petroski did not have marked difficulties in two of the following: age-appropriate cognitive/communicative function, age-appropriate social functioning, age-appropriate personal functioning, or maintaining concentration, persistence, or pace.  (*Id.*)

The ALJ determined that Petroski did not have an impairment or combination of impairments that equaled the listings.  (*Id.*)  The ALJ followed a two-step process in considering Petroski's symptoms.  The ALJ first determined that Petroski's impairments could reasonably be expected to produce his alleged symptoms.  Second, the ALJ explained in his findings that Petroski's allegations concerning intensity, persistence, and limiting effects of these symptoms were inconsistent with the evidence in the record.  (*Id.*, PageID.39-48.)

The ALJ considered Petroski's mother's disability report claiming disability due to ADHD, depression, anxiety, autism, mood disorder, a tic disorder, hypersomnia, and vision problems.  (*Id.*, PageID.39.)  In Petroski's activities report, his mother stated that Petroski had few friends and most of his friends were online, that he was stubborn, that he lacked the ability to focus, and that his classes were designed for emotionally impaired students.  (*Id.*, PageID.40.)

The ALJ noted that Petroski generally did well and his medication caused no side effects. (*Id*.) Although, the ALJ noted that Petroski struggled at times, he found that his struggles were not as severe as alleged. (*Id*.) The ALJ noted that Petroski generally had a cooperative attitude, normal communication, fair attention and concentration, intact memory, and a logical and coherent thought process. (*Id*., PageID.41.) Petroski withdrew from school in 2015, despite performing at grade level. (*Id*.) Petroski was considered by his teachers as academically capable, but his behaviors impacted his school performance. (*Id*.) Petroski did well at first, with virtual school, but then began to struggle. (*Id*.) Petroski's parents reported on October 2013, that he had been playing video games 10-12 hours per day during the prior year. (*Id*.)

The ALJ noted that treatment records showed that Petroski's mental condition was more severe before the application date. (*Id*.) His parents limited his video game time, but this upset Petroski. (*Id*.) His mental status examination showed mild increased psychomotor activity, nervousness, a mildly constricted mood, and a depressed mood. (*Id*.) Petroski was making good progress at school, but wanted to leave to play video games. (*Id*.) Overall, he became more stable in 2016. He experienced some difficulties in 2017, but even with those difficulties, Petroski could not meet a childhood disability listing. (*Id*.)

The ALJ considered and weighed opinion evidence. The ALJ assigned "significant weight" to the state agency psychological consultant who found that Petroski had less than marked limitations in all functional domains, except for

manipulating objects and in health and physical well-being, where he exhibited no limitations. (*Id*.) The ALJ specifically noted that the state agency psychological consultant found that while Petroski had some behavioral issues, he was "very capable" and treatment records established that throughout 2016, he remained stable with medication. (*Id*.) The consultant also found that, in 2017, Petroski did well despite some struggles. (*Id*.)

The ALJ also assigned "some weight" to Petroski's virtual teacher, Michael Davis, who indicated that Petroski had a slight problem or no problem in all areas. (*Id*. at PageID.42.)

The ALJ assigned "limited weight" to Petroski's scores in the Global Assessment of Functioning, or GAF system. Petroski scored from 40 to 50 on a scale from 0 to 100. The ALJ assigned limited weight to these scores because GAF scores are no longer recognized due to the subjectivity of the scores and because specific treatment notes are more persuasive. (*Id*.)

The ALJ assigned "limited weight" to the opinion of Dr. Razdan, who found that Petroski had marked limitations in his abilities to interact with others, concentrate, persist, maintain pace, adapt or manage himself, understand what to do, and maintain self-control while frustrated. (*Id*.) The ALJ concluded that Dr. Razdan's opinions were inconsistent with treatment and school records and were entitled to limited weight. (*Id*.) The ALJ noted that Petroski's mental examinations were mostly normal and when findings showed some abnormal areas, Petroski still exhibited intact concentration and attention. (*Id*.) In addition, the ALJ observed that

while Dr. Razdan indicated that Petroski had few friends, Petroski went to the prom and junior prom.  (*Id*.)

Dr. Razdan's opinion in a treatment note that Petroski could not function independently and needed support for housing, shelter, and monitoring his medications and finances was assigned little weight.   (*Id*.)  The ALJ explained that this opinion was inconsistent with Dr. Razdan's treating records, which stated that the claimant was generally doing well and that he was stable with few medication adjustments, and this opinion was also inconsistent with Petroski's school records showing that Petroski could pass his online classes.  (*Id*., at PageID.42-43.)

Some weight was assigned to statements by Petroski's father, who testified about Petroski's school problems and social isolation.  (*Id*., PageID.43.)  The ALJ viewed Petroski's school records and treatment records as more persuasive evidence of his abilities.  (*Id*.)

The ALJ fully considered the six domains of function and explained his findings regarding:

1. Acquiring and Using Information (less than marked limitation);

2. Attending and Completing Tasks (less than marked limitation);

3. Interacting and Relating with Others (less than marked limitation);

4. Moving About and Manipulating Objects (no limitation);

5. Caring for Yourself (less than marked limitation); and

6. Health and Physical Well-Being (no limitation).

(*Id*., PageID.43-48.)

Accordingly, the ALJ then reached the conclusion that Petroski was not under a disability as defined in the Social Security Act prior to attaining age 18. (*Id.*, PageID.48.)

The ALJ then considered whether Petroski was disabled after attaining age 18, by considering the five-step sequential analysis used for considering whether an adult is disabled under the Social Security rules.

The ALJ found that, after age 18, Petroski did not experience any new impairments and continued to have the same severe impairments (step two). (*Id.*) The ALJ found, at step three, that Petroski did not meet or equal a listed impairment. (*Id.*) The ALJ determined that the severity of Petroski's impairments did not meet or equal listings 12.04 and 12.06. (*Id.*) The ALJ found that Petroski had a moderate limitation in understanding, remembering, or applying information, in interacting with others, concentrating, persisting, maintaining pace, and adapting or managing himself. (*Id.*, at PageID.49.)

The ALJ made the following findings regarding Plaintiff's RFC:

> After careful consideration of the entire record, the undersigned finds that, since attaining age 18, the claimant has had the residual functional capacity to perform a full range of work at all exertional levels but with the following non-exertional limitations: the claimant is capable of understanding, remembering, and carrying out simple instructions and performing simple, routine tasks. Further, the claimant is limited to low stress occupations defined as having only occasional changes in the work setting. He is limited to occupations with no production-rate or pace work. The claimant is able to maintain concentration, persistence, and pace for simple tasks in two-hour increments, consistent with normal breaks and lunch. He is limited to only occasional interaction with co-workers, supervisors, and the public.

(*Id.*, PageID.50.)

In determining Petroski's RFC, the ALJ considered and explained the treatment and opinion evidence as described above in making his assessment for child disability benefits.  (*Id.,* PageID.50-52.)

At step four, the ALJ found that Petroski had no past relevant work, and was a younger individual, age 18-44.  (*Id.* at PageID.52-53.)

At step five, the ALJ analyzed Petroski's age, education, work experience, and RFC, and concluded that there were jobs that existed in significant numbers in the national economy that Petroski could perform.  (*Id.*, at PageID.53-54.)

The ALJ then reached the conclusion that Petroski was not under a disability as defined in the Social Security Act, from September 2, 2017, the day he attained age 18, through the date of decision on October 23, 2018.  (*Id.*, at PageID.54.)

## IV.    Standard of Review

Review of an ALJ's decision is limited to two issues: (1) "whether the ALJ applied the correct legal standards," and (2) "whether the findings of the ALJ are supported by substantial evidence."  *Winslow v. Comm'r of Soc. Sec.*, 566 F. App'x 418, 420 (6th Cir. 2014) (quoting *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009)); 42 U.S.C. § 405(g).  The Court may not conduct a *de novo* review of the case, resolve evidentiary conflicts, or decide questions of credibility.  *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). It is the Commissioner who is charged with finding the facts relevant to an application for disability benefits, and the Commissioner's findings are conclusive provided they are supported by substantial evidence. 42 U.S.C. § 405(g).

16

Substantial evidence is defined as more than a mere scintilla of evidence but "such relevant evidence that a reasonable mind might accept as adequate to support a conclusion." *Jones v. Sec'y of Health & Human Servs.*, 945 F.2d 1365, 1369 (6th Cir. 1991). In determining the substantiality of the evidence, the Court must consider the evidence on the record as a whole, and take into account whatever evidence in the record fairly detracts from its weight. *Richardson v. Sec'y of Health & Human Servs.*, 735 F.2d 962, 963 (6th Cir. 1984) (citations omitted). The substantial evidence standard presupposes the existence of a zone within which the decision maker can properly rule either way, without judicial interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citation omitted). This standard affords to the administrative decision maker considerable latitude, and indicates that a decision supported by substantial evidence will not be reversed simply because the evidence would have supported a contrary decision. *Bogle v. Sullivan*, 998 F.2d 342, 347 (6th Cir. 1993).

## V.    Analysis

Petroski argues (1) that the ALJ erred by not properly evaluating listings 112.04 and 112.11, and in failing to consider listing 112.06 relating to Petroski's anxiety impairment, (2) that the ALJ erred by failing to determine that his impairments met equivalency requirement to a listed impairment, (3) that the ALJ erred in considering the opinion of Petroski's treating psychiatrist, (4) that the ALJ erred in considering Petroski's credibility, and (5) that the ALJ erred in formulating Petroski's RFC.

### A.    Three-Step Sequential Analysis—Childhood Disability

An individual under the age of 18 "will be considered disabled if he has a medically determinable physical or mental impairment, which results in marked and severe functional limitations."    42 U.S.C. § 1382c(a)(3)(C)(i).  The ALJ must employ a three-step sequential analysis to determine whether a child under the age of 18 is disabled as defined by the Social Security Act.  *See* 20 C.F.R. § 416.924.

At step one, the ALJ determines whether the child has engaged in substantial gainful activity (SGA).  20 C.F.R. § 416.924(b).  The analysis proceeds to step two if the child has not engaged in SGA.  At step two, the ALJ determines whether the child's impairments are considered "severe."  20 C.F.R. § 416.924(c).  If the child has severe impairments, the analysis proceeds to step three. At step three the ALJ determines whether the child's impairments or combination of impairments meets a listed impairment, or medically or functionally equals a listed impairment.  20 C.F.R. § 416.924(d).

### B.    Five-Step Sequential Analysis—Adult Disability

Generally, the ALJ must employ a five-step sequential analysis to determine whether the claimant is disabled as defined by the Social Security Act.  *See* 20 C.F.R. § 404.1520; *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004).  At step one, the ALJ determines whether the claimant can still perform substantial gainful activity.  20 C.F.R. § 404.1520(a)(4)(i).  At step two, the ALJ determines whether the claimant's impairments are considered "severe."  20 C.F.R. § 404.1520(a)(4)(ii).  At step three, the ALJ determines whether the claimant's impairments meet or equal a

listing in 20 C.F.R. part 404, Subpart P, Appendix 1.  20 C.F.R. § 404.1520(a)(4)(iii).

Before proceeding to step four, the ALJ determines the claimant's residual functional

capacity (RFC).  20 C.F.R. § 404.1520(e).  At step four, the ALJ determines whether

the claimant has the RFC to still perform past relevant work.   20 C.F.R. §

404.1520(a)(4)(iv).  At step five, after considering the claimant's RFC, age, education,

and work experience, the ALJ determines whether a significant number of other jobs

exist in the national economy that the claimant can perform.   20 C.F.R. §

404.1520(a)(4)(v).  If the ALJ determines the claimant is not disabled under any step,

the analysis ceases and the claimant is declared not disabled.    20 C.F.R §

404.1520(a)(4).

### C.  The ALJ's Consideration of Whether Petroski Met a Listed Impairment

The ALJ found that Petroski did not meet or equal a childhood listed

impairment.  Petroski claims that the ALJ erred in his finding that Petroski failed to

meet or equal listing 112.04, Depressive Bipolar and Related Disorders, and listing

112.11, Neurodevelopmental Disorders.[1] Further, Petroski argues that the ALJ erred

by failing to consider listing 112.06, Anxiety and Obsessive-Compulsive Disorders.[2]

Petroski claims that he meets these listings or, alternatively, that his

impairments are functionally equivalent to these listed impairments.  The question

of whether a child – at the third and final step of the sequential evaluation – meets

one of the listings involves an analysis that is similar to the adult disability analysis.

20 C.F.R § 416.924(d) (childhood) and 20 C.F.R § 416.920(d) (adult).  It is the

claimant's burden to establish that his impairments meet or equal a listing.  *Evans*

*v. Sec'y of Health & Human Servs.*, 820 F.2d 161, 164 (6th Cir. 1987).  "Because

satisfying the listings yields an automatic determination of disability . . . the

---

[1]    Before getting to this argument, Petroski asserts that the ALJ erred at step
two by not concluding that his sleep disorder and obesity were severe impairments.
The ALJ found that Petroski had severe impairments and moved on to step three.
Therefore, since the ALJ moved on to step three by finding severe impairments at
step two, there can be no reversable error by failing to find additional severe
impairments. *Kirkland v. Comm'r of Soc. Sec.*, 528 F. App'x 425, 427 (6th Cir. 2013)
("[s]o long as the ALJ considers all of the individual's impairments, the 'failure to find
additional severe impairments … does not constitute reversible error").  Whether the
ALJ erred in consideration of the effects of Petroski's sleep disorder or obesity at other
steps, such as determining RFC, are separate issues.
        The ALJ, however, did consider Petroski's obesity and sleep issues and noted
that his providers encouraged him to lose weight, eat healthier, and to engage in a
more active lifestyle.  (ECF No. 6-2, PageID.38.)  The ALJ found that Petroski's
weight and asthma caused only minimal symptoms. (*Id.*) Similarly, Petroski's sleep
disorder was considered and the ALJ noted that Petroski had some issues with sleep
and at other times he reported sleeping well.  (*Id.*)  The ALJ found that Petroski's
sleeping issues were related to his mental health condition and would be considered
with his overall mental health.  (*Id.*)
[2]    At the hearing, Petroski's non-attorney representative stated that Petroski
possibly met listings 12.04 and 12.06.  (ECF No. 6-2, PageID.65.)  She represented
that Petroski could not meet the listings related to autism because that was ruled out
and, in addition, that he had no severe physical impairments.  (*Id.*, PageID.64.)

evidentiary standards for a presumptive disability under the listings are more strenuous." *Peterson v. Comm'r of Soc. Sec.,* 552 F. App'x. 533, 539 (6th Cir. 2014).

The ALJ should consider a medical listing if the record raises a substantial question as to whether the claimant could qualify as disabled under the listing. *Sheeks v. Comm'r of Soc. Sec.*, 544 F. App'x 639, 641 (6th Cir. 2013), citing *Abbot v. Sullivan*, 905 F.2d 918, 925 (6th Cir. 1990).  Where the ALJ makes findings elsewhere in the decision supporting the conclusion that the claimant did not meet a listing, the Court may affirm the decision because an ALJ need not "spell out every fact a second time." *Bledsoe v. Barnhart*, 165 F. App'x 408, 411 (6th Cir. 2006).  The ALJ's step three findings may be upheld where there are "factual findings elsewhere in his decision to support his conclusion." *Forrest v. Comm'r of Soc. Sec.*, 591 F. App'x 359, 366 (6th Cir. 2014).  An impairment that meets only some of the criteria set forth in a listing does not satisfy the claimant's burden to demonstrate disability under that listing. *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990).

The parties agree that listing 112.04, 112.06, and 112.11 each share similar B functional criteria.  The parties agree that in addition to meeting the A criteria under each listing, Petroski must establish that he also meets the B criteria before he could meet any of these listed impairments.[3]  Therefore, the Court will consider whether Petroski can meet the B criteria for each of these listings.

B criteria for Listings 112.04, 112.06, and 112.11 require a showing of:

---

[3]    Listings 112.04 and 112.06 also contain alternative C criteria that could be satisfied along with the A criteria instead of the B criteria.  Petroski does not claim that he meets or satisfies the C criteria in those listings.

B. Extreme limitation of one, or marked limitation of two, of the following areas of mental functioning:

1.  Understand, remember, or apply information.

    This area of mental functioning refers to the abilities to learn, recall, and use information to perform age-appropriate activities.  Examples include:  understanding and learning terms, instructions, procedures; following one- or two-step oral instructions to carry out a task; describing an activity to someone else; asking and answering questions and providing explanations; recognizing a mistake and correcting it; identifying and solving problems; sequencing multi-step activities; and using reason and judgment to make decisions.   Listing 112E (1)

2.  Interact with others.

    This area of mental functioning refers to the abilities to relate to others age-appropriately at home, at school, and in the community.  Examples include:  engaging in interactive play; cooperating with others; asking for help when needed; initiating and maintaining friendships; handling conflicts with others; stating own point of view; initiating or sustaining conversation; understanding and responding to social cues (physical, verbal, emotional); responding to requests, suggestions, criticism, correction, and challenges; and keeping social interactions free of excessive irritability, sensitivity, argumentativeness, or suspiciousness.  112E (2)

3.  Concentrate, persist, or maintain pace.

    This area of mental functioning refers to the abilities to focus attention on activities and stay on task age-appropriately.  Examples include:  initiating and performing an activity that you understand and know how to do; engaging in an activity at home or in school at an appropriate and consistent pace; completing tasks in a timely manner; ignoring or avoiding distractions while engaged in an activity or task; changing activities without being disruptive; engaging in an activity or task close to or with others without interrupting or distracting them;

> sustaining an ordinary routine and regular attendance at school; and engaging in activities at home, school, or in the community without needing an unusual amount of rest.   112E (3)

4.  Adapt or manage oneself.

> This area of mental functioning refers to the abilities to regulate emotions, control behavior, and maintain well-being in age-appropriate activities and settings.  Examples include:  responding to demands; adapting to changes; managing your psychologically based symptoms; distinguishing between acceptable and unacceptable performance in community- or school-related activities; setting goals; making plans independently of others; maintaining personal hygiene; and protecting yourself from harm and exploitation by others.   112E (4)

A marked limitation is defined as when the claimant's impairments interfere seriously with the ability to independently initiate, sustain, or complete activities.  20 C.F.R. 416.926a(e)(2).  It is more than moderate but less than extreme, or equivalent to standardized testing scores that are least two, but less than three, standard deviations below the mean.  *Id*.  An extreme limitation is defined as when the claimant's impairments interfere very seriously with the ability to independently initiate, sustain, or complete activities.  20 C.F.R. 416.926a(e)(3).  Extreme limitation means more than "marked" and is a rating given to the worst limitations.  *Id*.  However, it does not a mean a total lack or loss of the ability to function.  *Id*.  It is the equivalent to standardized testing scores that are at least three deviations below the mean.  *Id*.

The ALJ found that the "evidence as a whole fails to support any marked limitations in mental functioning." (ECF No. 6-2, PageID.39.) The ALJ discussed those findings in his analysis.

### 1. Understand, Remember, or Apply Information

ALJ Shenkenberg found that Petroski had less than a marked limitation in acquiring and using information. (*Id.*, PageID.43.) The ALJ correctly cited portions of the record where Petroski's teachers reported he had no problems or slight problems in this subarea (*id.*, (citing ECF No. 6-6, PageID.265 (Exh. 4E)), and that he was "academically very capable." (*Id.* (citing ECF No. 6-6, PageID.240) (Exh. 1E).) Petroski had intact memory and good concentration. (ECF No. 6-8, PageID.400.) Despite some struggles in school, Petroski was able to do well and pass his classes while in online school. (*Id.*, PageID.352, 364, 368.) Consultant Dr. Ron Marshall, Ph.D., found that Petroski had no more than moderate limitations with understanding and remembering and in carrying out detailed instructions, and that he was not significantly limited in carrying out short and simple instructions. (*Id.*, PageID.470.) And Dr. Razdan opined that Petroski had only moderate limitation in his ability to understand, remember, or apply information. (*Id.*, PageID.534.)

### 2. Interact With Others

The ALJ found that Petroski had difficulty in this area, but that his limitations were less than marked. (ECF No. 6-2, PageID.45.) The ALJ noted that Petroski's mother reported that he tended to isolate himself while he played video games. (*Id.* (citing ECF No. 6-6, PageID.279 (Exh. 5E).) The ALJ also cited portions of the record

indicating that Petroski had a girlfriend, loves to dance, and attended the prom.  (*Id*. (citing ECF No. 6-8, PageID.358 (Exh. 2F); ECF No. 6-9, PageID.566 (Exh. 14F).)

Petroski was described as cooperative and communicative during his medical examinations with Dr. Razdan.  (ECF No. 6-8, PageID.354 ,360, 366, 372, 385, 406, 431.)  Nevertheless, Dr. Razdan, checked off a box that indicated that Petroski has a marked inability to interact with others.  (ECF No. 6-9, PageID.534.)  This conclusion contrasts with Dr. Razdan's records and the conclusion reached by Dr. Marshall, who found that Petroski had no more than moderate limitations in social interaction. (ECF No. 6-9, PageID.471.)

### 3.  Concentrate, Persist, or Maintain Pace

The ALJ acknowledged that Petroski had moderate limitations in the areas of concentration, persistence and maintaining pace.  (ECF No. 6-2, ECF No. 49.) Despite his problems with school, Petroski was able to stay at grade level and pass his classes.  (*Id*. (citing ECF No. 6-8, PageID.352, 364, 368); *see also* PageID.354, 361, 364, 367, 373 (discussing Petroski's school performance).)  Further, the ALJ noted that it is undisputed that Petroski had the ability to concentrate and play video games for extended periods of time.  (*Id*.)  In addition, Dr. Marshall found that Petroski had no more than moderate limitations in concentration, persistence, and pace.  (ECF No. 6-9, PageID.470-471.)

### 4.  Adapt or Manage Oneself

The ALJ noted that Petroski had moderate limitations in adapting and managing himself.  (ECF No. 6-2, PageID.49.)  The ALJ noted that Petroski's parents

said that he was not motivated to get dressed or to leave his room.  (*Id*.)  But the ALJ noted that Dr. Razdan repeatedly indicated that Petroski was appropriately dressed and groomed and consistently attended the appointments.  (*Id*.)

The record shows that the ALJ appropriately considered listings 112.04 and 112.11 and found that Petroski did not have marked or severe limitations in any of the four B criteria of mental functioning.  In addition, despite not considering listing 112.06, the same four B criteria apply to that listing.  Petroski argues that the ALJ failed to point out each part of the record that supports limitations in each of these functional domains.  As noted above, the ALJ found that Petroski had some limitations in each of the four functional domains, but concluded that his limitations failed to rise above a moderate level of limitation.

The court reviews to determine whether the record, as a whole, provides substantial evidence that could support the ALJ's decision, not whether the record contains contrary evidence that could support the claimant's position.  *Bogle*, 998 F.3d at 347.  The ALJ explained his reasoning for finding that Petroski could not meet the B criteria of the listings.  The ALJ provided good reasons for his findings and his findings are supported by substantial evidence.  In the opinion of the undersigned, the ALJ's decision that Petroski could not meet the social security listings is supported by the record and the evidence cited in the ALJ's decision.

### D. The ALJ's Consideration of Whether Petroski Equaled a Listed Impairment

Alternatively, Petroski argues that his impairments are functionally equivalent to the listed impairments and that the ALJ erred by failing to make this

finding.  The criteria for the six domains of functional equivalence to a listing are set out in 20 C.F.R. § 416.926a:

       (1) Acquiring and using information;

       (2) Attending and completing tasks;

       (3) Interacting and relating with others;

       (4) Moving about and manipulating objects;

       (5) Caring for yourself; and

       (6) Health and physical well-being.

20 C.F.R. § 416.926a(b)(1).  To establish that a functional impairment equals a listing, it is the claimant's burden to show an extreme limitation in one domain or a marked impairment in more than one.  20 C.F.R. § 416.926a(d).

The ALJ addressed each of the six functional domains and found that Petroski had less than marked limitation in each of these domains.  (ECF No. 6-2, PageID.43-48.)  Petroski argues that he had at least a marked limitation, if not an extreme limitation, in three of the functional domains – acquiring and using information, attending and completing tasks, and caring for himself.  (ECF No. 13, PageID.630.)

Petroski argues that the ALJ ignored much of the evidence in the record that establishes he had at least marked limitations in these functional areas.  Petroski argues that in making his finding, the ALJ erred in discounting Petroski's credibility regarding the intensity of alleged mental symptoms and the opinion evidence from treating psychiatrist Dr. Razdan.

### 1. The ALJ's Consideration of Petroski's Symptoms in Determining if Symptoms Equal a Listed Impairment

Petroski argues that the ALJ erred when he determined that Petroski's symptoms concerning intensity, persistence and limiting effects were not entirely consistent with the objective medical evidence because the ALJ focused on the medical record that supported this conclusion and failed to consider more recent evidence showing that Petroski continued to struggle with his impairments.[4] Petroski argues that the ALJ failed to consider that he needs the support of his parents, that he dropped out of online schooling because he was overwhelmed and never obtained a GED[5], his hypersomnia, and Dr. Razdan's notes in March of 2018 regarding medication changes because of tiredness, or due to worsening mental conditions despite a brief period of improvement.

An ALJ's factual findings concerning a claimant's subjective symptoms are peculiarly within the province of the ALJ. *Gooch v. Secretary of Health & Human Servs.*, 833 F.2d 589, 592 (6th Cir. 1987); 20 C.F.R. § 404.1529; SSR *16-3p*. The Court's "review of a decision of the Commissioner of Social Security, made through

---

[4]    In Petroski's statement of errors, he argues that the ALJ erred by not having another medical expert provide an opinion regarding equivalency to a listed impairment. (ECF No. 13, PageID.607, 635.) It appears that Petroski is arguing that, without an independent expert opinion, the ALJ had no choice but to accept Dr. Razdan's opinion and find Petroski disabled. The ALJ is not required to obtain a medical expert and it is the ALJ's responsibility to determine whether a claimant is disabled. *Rudd v. Comm'r of Soc. Sec.*, 531 F. App'x 719, 76 (6th Cir. 2013). The ALJ found that Dr. Razdan's opinion was inconsistent with the medical treatment notes and Petroski's abilities at school and in daily living.

[5]    Petroski argues "that there is no evidence that the GED was ever completed." (ECF No. 13, PageID.636.)

an administrative law judge, is extremely circumscribed[.]"  *Kuhn v. Commissioner*, 124 F. App'x 943, 945 (6th Cir. 2005).  The Commissioner's findings are reviewed under the "substantial evidence" standard.  This is a "highly deferential standard of review."  *Ulman v. Commissioner*, 693 F.3d 709, 714 (6th Cir. 2012).  Claimants challenging the ALJ's findings "face an uphill battle."  *Daniels v. Commissioner*, 152 F. App'x 485, 488 (6th Cir. 2005).  The Court must accord the ALJ's findings "great weight and deference particularly since the ALJ has the opportunity, which [the court] d[oes] not, of observing a witness's demeanor while testifying."  *Jones v. Comm'r of Soc. Sec.,* 336 F.3d 469, 476 (6th Cir. 2003); *Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir. 2001).

But the Sixth Circuit recognizes that meaningful appellate review requires more than a blanket assertion by an ALJ that "the claimant is not believable."  *Rogers v. Commissioner*, 486 F.3d 234, 248 (6th Cir. 2007).  The *Rogers* court observed that the ALJ must explain his evaluation of the claimants symptoms and that the explanation " 'must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.' "  *Id.* (quoting a *Policy Interpretation Ruling Titles II and XVI: Evaluation of Symptoms in Assessing Disability Claims: Assessing the Credibility of an Individual's Statements,* SSR *96-7p, superseded by* SSR *16-3p* (reprinted at 1996 WL 374186, at *4 (SSA July 2, 1996)).

The ALJ found that Petroski's alleged symptoms were inconsistent with the medical record.  (ECF No. 6-2, PageID.40.)  The ALJ explained that Petroski

functioned "fairly well" with the treatment and management of his mental impairments. (*Id*.) The ALJ noted that Petroski's mental examinations in 2015 and 2016 showed that he was doing well with his medications, was stable, and exhibited normal speech, behavior, and judgment, and that he was passing all of his classes with help from his mother. (*Id*.) The ALJ discussed Petroski's struggles in 2017, but found them not as severe as alleged. (*Id*.) Petroski was planning on attending prom with his girlfriend, and although he discontinued his online schooling, he indicated that he planned to get a GED. (*Id*.) Petroski claimed that he was having sleep troubles, and was irritable and angry, but his father reported that their relationship had improved (*id*) and Petroski reported that he was no longer threatening or aggressive toward his parents. (*Id*., PageID.41.)

The ALJ noted that Petroski was working at grade level when he withdrew from school, and his teacher felt that he was academically very capable. (*Id*.) Petroski initially did well with online school, but his mother felt that he would do better taking one class at a time, instead of a full course load. (*Id*.) The ALJ acknowledged some behavioral issues inhibited his school performance, but found that, even considering these issues, Petroski could not meet the mental listing requirements. (*Id*.)

The ALJ further acknowledged that Petroski's mental symptoms were more severe before the date of application. (*Id*.) Petroski's parents reported that he played video games 10 to 12 hours per day the prior year, and that intensive video game playing had caused a seizure. (*Id*.) Petroski had exhibited sensory problems in that he did not want to shower, brush his teeth, or change his clothes. (*Id*.) The ALJ noted

that although Petroski wanted to leave school to play video games, he was adjusting to his new school and was able to focus on the material.  (*Id*.)  The ALJ noted that Petroski stabilized in 2016, but that his difficulties in 2017 did not provide a basis to meet the childhood listings.  (*Id*.)

### 2.  The ALJ's Consideration of Dr. Razdan's Opinion note and RFC Questionnaire in Determining if Symptoms Equal a Listed Impairment

Petroski argues that the ALJ erred by giving limited weight to Dr. Razdan's RFC questionnaire, which identified marked limitations in his abilities to interact with others, concentrate, persist, maintain pace, adapt or manage himself, understand what to do, and exercise self-control when frustrated with a task; and little weight to Dr. Razdan's treatment note, which opined that Petroski was dependent on his parents for housing, shelter, and monitoring his medications and finances.  (*Id*.)  Dr. Razdan believed that Petroski was eligible for disability benefits. (*Id*.)  The ALJ found that these opinions were inconsistent with Dr. Razdan's treatment history and inconsistent with Petroski's school records.

The ALJ must give controlling weight to a treating physician's medical opinion when (1) the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) the opinion "is not inconsistent with the other substantial evidence in the case record." *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 375-76 (6th Cir. 2013) (quoting 20 C.F.R. § 404.1527).  If an ALJ affords less than controlling weight to a treating source's opinion, the ALJ must provide "good

reasons" for discounting the opinion.  *Id.* at 376.  An ALJ must consider the following factors:

1.  length of the treatment relationship and frequency of examinations,

2.  nature and extent of the treatment relationship,

3.  supportability of the opinion,

4.  consistency of the opinion with the record as a whole,

5.  the specialization of the treating source, and

6.  other relevant factors.

*See* 20 C.F.R. §§ 404.1527, 416.927; *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th 2004).

But these regulations require "only that the ALJ's decision include 'good reasons ... for the weight ... give[n] [to the] treating source's opinion – not an exhaustive factor-by-factor analysis." *Francis v Comm'r of Soc. Sec.*, 414 F. App'x 802, 804-05 (6th 2011).  The ALJ is not required to explicitly discuss each of these factors.  Instead, record must reflect that ALJ considered those factors relevant to his assessment.  *See, e.g., Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007); *Undheim v. Barnhart*, 214 Fed. Appx. 448, 450 (5th Cir., Jan.19, 2007).  An example of a good reason is that the treating physician's opinion is "unsupported by sufficient clinical findings and is inconsistent with the rest of the evidence." *Conner v. Comm'r of Soc. Sec.*, 658 F. Appx. 248, 253 (6th Cir. 2016).

Petroski argues that Dr. Razdan's opinions in the RFC questionnaire are similar to the opinions expressed by the treating psychiatrist in *Houghton v. Comm'r*

*of Soc. Sec.*, 2016 WL 1156597 (W.D. Mich., Mar. 4, 2016).  In that case, the Court determined that the ALJ improperly discounted the treating psychiatrist's opinions in an RFC questionnaire by failing to give good reasons, failing to address the diagnosis and medical history, and by only concentrating on the Global Assessment Functioning scores, which, the ALJ determined, were not a sufficient indicator of limitations.  *Id*. at \*4.

However, in this case, ALJ Shenkenberg explained his reasoning for giving less than controlling weight to Dr. Razdan's opinions.  He explained that the medical records, diagnosis, and Petroski's abilities, which he conceded showed severe impairments with some limitations, failed to support Dr. Razdan's RFC conclusions and his opinion that Petroski could not work.  The ALJ then concluded that the inconsistencies in the medical record, including Dr. Razdan's examinations, failed to support marked limitations in the functional domain areas, and more specifically failed to show that Petroski was incapable of performing work in the national economy.  Rather, the ALJ found that the medical record, which included Dr. Razdan's mental examinations, supported the conclusion that Petroski could perform work in the national economy.  (ECF No. 6-2, PageID.52.)  In the opinion of the undersigned, the ALJ set forth good reasons based upon the medical record to give less than controlling weight to Dr. Razdan's opinions that Petroski was unable to perform substantial gainful activity.

### 3. The ALJ's Consideration of Petroski's Alleged Symptoms, Dr. Razdan's Opinions and the Entirety of the Medical Evidence Regarding the Three Functional Domains – acquiring and using information, attending and completing tasks, and caring for himself

Petroski argues that if the ALJ credited all of his symptoms, the opinion of Dr. Razdan, and the medical record that supports his claim of disability, the ALJ would have found at least marked limitations in acquiring and using information, attending and completing tasks, and in caring for himself. Petroski argues that the ALJ erred by not finding that he equaled a listed impairment because he has three marked limitations in the functional domains and he only needs two marked limitations to find that he equals a listed impairment.

In the opinion of the undersigned, substantial evidence exists in the record to support the ALJ's finding that Petroski's impairments do not equal a listed impairment, and that Petroski does not have marked limitations in the functional domain categories of acquiring and using information, attending and completing tasks, and in caring for himself.

#### i. Acquiring and Using Information

Petroski argues that the ALJ should have determined that he has marked limitations in acquiring and using information. Adolescents age 12 to 18 years of age, should be able to demonstrate what was learned from academic assignments, comprehend and express simple and complex ideas using increasingly complex language, and apply learned skills in practical ways. 20 C.F.R. 416.926a(g)(2)(v). The regulations provide examples of limited functioning in this area as:

(i) You do not demonstrate understanding of words about space, size, or time; e.g., in/under, big/little, morning/night.

(ii) You cannot rhyme words or the sounds in words.

(iii) You have difficulty recalling important things you learned in school yesterday.

(iv) You have difficulty solving mathematics questions or computing arithmetic answers.

(v) You talk only in short, simple sentences and have difficulty explaining what you mean.

20 C.F.R. 416.926a(g)(3).

The ALJ noted that Petroski's teachers indicated that he did not have problems in this domain area. (ECF No. 6-2, PageID.43.) Further, the ALJ noted that problems that Petroski had with school did not appear related to his ability to acquire and use information. (*Id*., PageID.44.) The ALJ determined that mental examinations failed to document problems in this area and that Dr. Razdan found only moderate limitations in this domain.

In addition, the ALJ noted that Petroski's teachers reported no problems or slight problems, and that he was "academically very capable." (ECF No. 6-2, PageID.41) Petroski had intact memory and good concentration. (ECF No. 6-8, PageID.400.) Despite some struggles in school, Petroski was able to do well and pass his classes while taking online courses. (*Id*., PageID.352, 364, 368.) Dr. Razdan opined that Petroski had only moderate limitations in his ability to understand, remember, or apply information, concentrate on the task at hand, and to engage in a task around others. (ECF No. 6-9, PageID.534.) Dr. Razdan's assessment is below:

**Definitions of Ratings Below:**

**None**     No impairment
**Mild**     Impairment in function (up to 25% of the time)
**Moderate**  Impairment in function (up to 50% of the time)
**Marked**   Serious impairment to function independently (up to 75%)
**Extreme**  No ability to function in this area

1. Ability to understand, remember or apply information
_____ None _____ Mild __X__ Moderate _____ Marked _____ Extreme

2. Ability to interact with others
_____ None _____ Mild _____ Moderate __X__ Marked _____ Extreme

3. Ability to concentrate, persist or maintain pace
_____ None _____ Mild _____ Moderate __X__ Marked _____ Extreme

4. Ability to adapt or manage oneself
_____ None _____ Mild _____ Moderate __X__ Marked _____ Extreme

5. Difficulty understanding what to do
_____ None _____ Mild _____ Moderate __X__ Marked _____ Extreme

6. Trouble concentrating on the task at hand
_____ None _____ Mild __X__ Moderate _____ Marked _____ Extreme

7. Becoming so frustrated in the task that the person loses self control
_____ None _____ Mild _____ Moderate __X__ Marked _____ Extreme

8. Being able to engage in the task around others
_____ None _____ Mild __X__ Moderate _____ Marked _____ Extrem

(*Id.*)

Consultant Dr. Ron Marshall, Ph.D., who found less than marked limitations in all domain areas, agreed with Dr. Razdan's assessment in this domain area. (*Id.*, PageID.470.)  In the opinion of the undersigned, the ALJ cited good reasons and substantial evidence supports his finding that Petroski had less than a marked limitation in his ability to acquire and use information.

36

### ii. Attending and Completing Tasks

Petroski argues that the ALJ should have found that he had a marked limitation in attending and completing tasks.  Adolescents age 12 to 18 should be able to pay attention to increasingly longer presentations and discussions, maintain concentration while reading, plan and complete projects, organize materials and complete tasks and assignments, and maintain attention for extended periods of time and not be distracted by peers or distract them in school or a work setting.  20 C.F.R. 416.926a(h)(v).  The regulations provide examples of limited functioning in this area as:

> (i) You are easily startled, distracted, or overreactive to sounds, sights, movements, or touch.
>
> (ii) You are slow to focus on, or fail to complete activities of interest to you, e.g., games or art projects.
>
> (iii) You repeatedly become sidetracked from your activities or you frequently interrupt others.
>
> (iv) You are easily frustrated and give up on tasks, including ones you are capable of completing.
>
> (v) You require extra supervision to keep you engaged in an activity.

20 C.F.R. 416.926a(h)(3).

The ALJ acknowledged that Petroski has some difficulties in this area.  (ECF No. 6-2, PageID.44.)  The ALJ found that Petroski had attention deficit disorder.  The ALJ credited Petroski's father's testimony, which was consistent with his mother's concerns that Petroski had difficulties in school because of the amount of work that was due by a specific deadline.  (*Id.*)  Petroski's mother indicated that he could be

successful in school if could concentrate on one class at a time.  (*Id.*)  However, the ALJ noted and cited portions of the record showing that Petroski's mental examinations consistently fail to note any marked concentration deficits.  (ECF No. 6-8, PageID.354-355, 360-361, 366-367, 372-373, 378-380, 385-386, 406-407, 412-413, 431-432, 439-440, 451-452, ECF No. 6-9, PageID.489-490, 493-494, 497-498.)

Petroski's case manager, Deborah Cieslinski, noted in Bio-Psycho-Social Assessments that Petroski had fair to good attention and concentration with intact memory.  (ECF No. 6-8, PageID.400, ECF No. 6-9, PageID.518.)  Further, the ALJ relied on Dr. Marshall's assessment that Petroski had less than a marked limitation in this area.  (ECF No. 6-2, PageID.44.)  In the opinion of the undersigned, the ALJ cited good reasons and substantial evidence supports his finding that Petroski has less than marked limitation in his ability to attend and complete tasks.

### iii.  Caring for Himself

Petroski argues that the ALJ erred by not finding at least a marked limitation in his ability to care for himself.  Adolescents age 12 to 18 years old should be able to become increasingly more independent in day-to-day activities, but sometimes may experience confusion in self feelings, notice changes in body development, and may worry about body changes which may cause feelings of anger or frustration.  20 C.F.R. 416.926a(k)(v).  An adolescent in this age group should be able to appropriately express good and bad feelings, and begin to think seriously about future plans. (*Id.*)  The regulations provide examples of limited functioning in this area as:

(i) You continue to place non-nutritive or inedible objects in your mouth.

(ii) You often use self-soothing activities showing developmental regression (e.g., thumbsucking, re-chewing food), or you have restrictive or stereotyped mannerisms (e.g., body rocking, headbanging).

(iii) You do not dress or bathe yourself appropriately for your age because you have an impairment(s) that affects this domain.

(iv) You engage in self-injurious behavior (e.g., suicidal thoughts or actions, self-inflicted injury, or refusal to take your medication), or you ignore safety rules.

(v) You do not spontaneously pursue enjoyable activities or interests.

(vi) You have disturbance in eating or sleeping patterns.

20 C.F.R. 416.926a(k)(3).

Again, the ALJ noted and agreed with Petroski's parents that he had some difficulties in this area.  (ECF No. 6-2, PageID.47.)  The medical record shows that Petroski had some difficulties with sleep, and on occasion he did not want to bathe or dress, and although he had some self-injurious thought in the past, he indicated that he was simply acting out or seeking attention and he would not harm himself.  (ECF No. 6-9, PageID.515, 517.)  He enjoyed playing video games and watching anime movies.  (ECF No. 6-2, PageID.74-76.)  While Dr. Razdan indicated that Petroski had marked limitations in ability to manage himself and that his parents needed to care for him by providing housing and managing his medications and finances, the ALJ found that some of his difficulties in this area were "developmental appropriate for the claimant's age."  (ECF No. 6-2, PageID.47.)  Dr. Razdan consistently noted that Petroski was appropriately groomed during exams.  (*Id*.)  Dr. Marshall found that Petroski was moderately limited in his ability to maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness and was not

significantly limited in his ability to recognize normal hazards and to take appropriate precautions. (ECF No. 6-9, PageID.471.) The ALJ found that Petroski had less than marked limitation in this domain function. (*Id*.)

The ALJ gave little weight to the Dr. Razdan's treatment note that Petroski was dependent on his parents, because that treatment note was inconsistent with Dr. Razdan's treatment record of Petroski. As previously explained, Dr. Razdan wrote on February 8, 2018:

> 4. We discussed that Jayson, at this point and time, is not able to take care of himself. He cannot live independently. He is emotionally impaired to function independently and needs the support of his parents for housing, shelter, monitoring his medications, administering his medications and so on. He would benefit from continuing support of his parents. His father mentioned that they have applied for disability and I feel that at this point and time, Jayson might qualify for disability given the severity of functional impairment secondary to his symptoms.

(*Id*., PageID.498.) However, as the ALJ pointed out, this opinion note was inconsistent with Dr. Razdan's overall treatment record of Petroski. In the opinion of the undersigned, the ALJ cited good reasons and substantial evidence supports his finding that Petroski has less than marked limitation in his ability to care for himself.

### 4. The ALJ's RFC Finding

Petroski argues that his mental impairments prevent him from working. In denying Petroski adult disability benefits, the ALJ found that he could perform the full range of work at all exertional levels, with the non-exertional limitations of carrying out simple instructions and performing simple, routine tasks, in low stress occupations defined as having only occasional changes in the work setting, no production-rate or pace work, performing simple tasks in two-hour increments, consistent with normal breaks and lunch, and limited to only occasional interaction with co-workers, supervisors, and the public. (ECF No. 6-2, PageID.50.) Petroski

argues that this finding was in error, because he would be off task more than fifteen percent of the time, and would miss more than two days of work per month, and he is precluded from all employment based upon Dr. Razdan's opinion.  In addition, Petroski argues that the ALJ erred in each of the hypothetical questions presented to the vocational expert.

RFC is the most, not the least, a claimant can do despite his impairments.  20 C.F.R. §§ 404.1545(a), 416.945(a)(1); *Branon v. Comm'r of Soc. Sec.*, 539 F. App'x 675, 677 n.3 (6th Cir. 2013); *Griffeth v. Comm'r of Soc. Sec.*, 217 F. App'x 425, 429 (6th Cir. 2007).  RFC is an administrative finding of fact reserved to the Commissioner. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2); *Deaton v. Comm'r of Soc. Sec.*, 315 F. App'x 595, 598 (6th Cir. 2009).  While the RFC determination is made by the ALJ, an ALJ's RFC determination must be supported by substantial evidence.  *Torres v. Comm'r of Soc. Sec*, 490 F. App'x 748, 754 (6th Cir. 2012).  If the record contains "conflicting evidence that would suggest further limitations, under the substantial evidence standard, administrative findings are not subject to reversal merely because substantial evidence exists in the record to support a different conclusion." *Id.*

A review of the record indicates that the ALJ's RFC assessment is supported by substantial evidence.  In general, an "RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)."  SSR 96-8P, 1996 WL 374184 (July 2, 1996).

41

As previously explained, the ALJ set forth good reasons in giving less than significant weight to Dr. Razdan's opinions on Petroski's disability.  The ALJ found that Petroski could perform work such as busser, packager, dishwasher, mail sorter, or laundry worker based upon Petroski's abilities to perform work at all exertional levels with limitations that were due to his mental impairments.  (ECF No. 6-2, PageID.53.)   Petroski has not explained how the ALJ erred in his hypothetical questions to the vocational export other than by arguing that the ALJ's hypothetical question "did not comply with the strictures of *Varley v. Secretary of Health and Human Services*, 820 F.2d 777, 779 (6th Cir. 1987)."  (ECF No. 13, PageID.636.) However, in that case, the court of appeals stated that the ALJ could rely on the vocational expert if the hypothetical question accurately portrayed the claimant's impairments.  *Id*.  In addition, the court held that the ALJ was correct in looking at the examination notes and not just the physicians and psychologist's diagnosis of a severe chronic condition.  *Id*.

In this case, the ALJ considered the entire medical record and not just Dr. Razdan's opinion note and answers to his RFC questionnaire.  The ALJ considered that Petroski failed to complete school, lacked motivation, and exhibited problems with concentration, attention, and completing tasks.  (ECF No. 6-2, PageID.50.)  The ALJ noted that, in January of 2018, Petroski was not happy about becoming an adult and making decisions for himself.  (*Id*.)  Petroski's provider made medication changes over the preceding six months, with the last change coming just before he turned 18 years old.  (*Id*.)  The ALJ noted that Petroski received minimal treatment since he

turned 18, attended his appointments and took his medication as prescribed. (*Id*.) Further, in considering Petroski's RFC, the ALJ noted that Petroski's mother thought he could be successful if allowed to complete one task at a time, which fit the findings of unskilled work, with limited interaction, minimal changes, reduced concentration, and no fast paced production. (*Id*., PageID.51.) The ALJ appropriately relied on the state agency psychological consultant, and Petroski's teacher in formulating the RFC. (*Id*.) Finally, the ALJ gave good reasons in giving limited and little weight to Dr. Razdan's opinions and some weight to Petroski's father's testimony. (*Id*., PageID.52.)

More importantly, Petroski has failed to indicate that the ALJ made any specific errors in his RFC finding other than arguing that he was not able to perform work and should have been considered disabled. In the opinion of the undersigned, the ALJ reached a procedurally proper RFC conclusion that was supported by substantial evidence.

## VI.  Recommendation

The Court is sympathetic toward Petroski and understands that he does have some impairments. The record, however, indicates that the ALJ conducted an appropriate review of the Social Security Administration's denial of Petroski's disability claims. The ALJ's findings fully considered the medical records, which included Dr. Razdan's opinions.

In the opinion of the undersigned, the entire record provides substantial evidence that supports the Commissioner's decision that Petroski is not disabled as defined by the Social Security Administration.

For these reasons, it is the recommendation of the undersigned that the Court affirm the Commissioner's decision.

NOTICE TO PARTIES:  Objections to this Report and Recommendation must be served on opposing parties and filed with the Clerk of the Court within fourteen (14) days of receipt of this Report and Recommendation.  28 U.S.C. § 636(b)(1)(C); Fed. R. Civ. P. 72(b); W.D. Mich. LCivR 72.3(b).  Failure to file timely objections constitutes a waiver of any further right to appeal.  *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See also Thomas v. Arn*, 474 U.S. 140 (1985).


/s/ *Maarten Vermaat*
Maarten Vermaat
U. S. MAGISTRATE JUDGE

Dated:   September 10, 2020